PETER A. WALKER (PW-7984)
LORI M. MEYERS (LM-1913)
SEYFARTH SHAW LLP
1270 Avenue of the Americas, Suite 2500
New York, New York 10020
(212) 218-5500

Attorneys for Defendant
 The NYC Leadership Academy, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                 :
AGNES HOWELL,                                                    :     **ECF CASE**
                                                                 :
                                        Plaintiff,              :     05 Civ. 8233 (JGK-RLE)
                                                                 :
                        - against -                             :
                                                                 :
THE NYC LEADERSHIP ACADEMY, INC., and                           :
NEW YORK CITY DEPARTMENT OF                                     :
EDUCATION,                                                      :
                                                                 :
                                        Defendants.             :
-----------------------------------------------------------------x


**DEFENDANT THE NYC LEADERSHIP ACADEMY, INC.'S STATEMENT OF
UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

     Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the

Southern and Eastern Districts of New York, Defendant, The NYC Leadership Academy, Inc.

(the "Academy") submits this statement of material facts as to which it contends there is no

genuine issue to be tried.[1]

------------------------

[1]      The undisputed facts set forth herein are followed by citations to their support in the
record.  Copies of all pleadings, deposition testimony and exhibits cited herein are annexed to the
accompanying Affidavit of Peter A. Walker, dated June 29, 2007 ("Walker Aff.").

**The Parties**

1.     Defendant Academy is a domestic, not-for-profit corporation organized under the laws of the State of New York with its principal office in Long Island City, New York.  (Compl. ¶ 2, attached as Exhibit A to the Walker Aff.; Academy Answer ¶ 2, attached as Exhibit B to the Walker Aff.)

2.     The Academy was created in 2003 to recruit, train and provide support for a new generation of principals, by developing instructional leadership and management expertise of New York City public school principals.  (Walker Aff., Academy Answer, Ex. B ¶ 5.)

3.     Defendant New York City Department of Education ("DOE") manages the city's public school system and has the powers and duties identified in N.Y. Education Law §2590-g. (DOE Answer, ¶ 3, attached as Exhibit C to the Walker Aff.)

4.     Agnes Howell-Jack ("Howell") is a New York City Department of Education ("DOE") employee and former participant in the Academy who is suing the Academy and the DOE for, *inter alia*, race discrimination and retaliation.  (Walker Aff., Ex. A.)

**Howell's Educational Background and Employment History**

5.     Howell is a native of Trinidad and received her teaching certificate, bachelor of arts degree and doctorate in education in the West Indies.  (Transcript of the Deposition of Agnes Howell-Jack, attached as Exhibit D to the Walker Aff. at 9:14-10:22.)

6.     Howell's first employment in the United States was as a teacher of special education in P.S. 175.  She held this position, first on a part-time basis, then as a substitute, and then as a full-time employee, beginning in 1991 and continuing until she entered the Academy in 2004, except for a brief two-year period between 1998 and 2000 when she served as an assistant principal at the James McCune Smith Public School.  (Walker Aff., Ex. D at 14:4-15:4, 18:14-17, 19:22-25, 20:5-21:17.)

2

7.     In 1983 Howell created a school in Trinidad.  Since 1989 she has been the Director of Curriculum.  In this capacity, she regularly travels to Trinidad, designs and works with the curriculum, is involved in hiring teachers and conducting teacher evaluations and spends approximately thirty minutes each evening on functions related to this school.  (Walker Aff., Ex. D at 30:15-36:23, 90:18-23.)

**Howell's Selection for the Academy**

8.     Howell applied for entrance into the Academy in 2003, its first year of operation, but was not selected.  She offered no reason as to why she was not selected, but did acknowledge that her application lacked a timely recommendation from the District in which she worked, a requirement of the Aspiring Principal's Program ("APP" or the "Program") for which she sought entrance.  (Walker Aff., Ex. D at 26:21-28:24, 29:5-30:8.)  Howell does not claim in this lawsuit that her failure to be selected to the Program in 2003 was discriminatory.  (Walker Aff., Ex. A.)

9.     Howell applied for admission into the Program again in 2004 and, after interviewing with two Caucasian Academy employees, was accepted into the Academy's July 2004 Program.  (Walker Aff., Ex. D at 38:22-39:8, 42:19-43:25, 44:16-24; Exhibit E.)

10.     Prior to participating in the Program, Howell had not spoken to any prior Program participants about the Program, although she knew that Larry Wilson, an African American colleague from P.S. 175, had completed the APP in its first year of operation and was thereafter appointed as a principal.  (Walker Aff., Ex. D at 37:3-38:13.)

**The Academy's Requirements**

11.     The 2004 APP began on or about June 28, 2004 with an intensive summer classroom program at which participants were engaged in simulations and were required to demonstrate competencies in written work and verbal performance.  Attendance was a required and an integral component of the Program.  (Walker Aff., Ex. D at 47:6-50:21.)

3

12.     At the beginning of the Program, the participants were told that approximately ten participants from the previous year, did not complete the Program.  (Walker Aff., Ex. D at 51:3-24.)

13.     In fact, during the summer of 2004, approximately three or four students were removed from the Program because it was determined that they would not grow sufficiently during the fourteen months of the Program to achieve the skills needed to become a principal. (Transcript of the Deposition of Claire McIntee, attached as Exhibit F to the Walker Aff. at 33:4-9, 22-23; Transcript of the Deposition of Ilene Friedman, attached as Exhibit G to the Walker Aff. at 33:18-36:7.)

14.     After the summer intensive classroom program, Program participants began the Program's residency phase.  During the residency phase participants were assigned (typically in groups of two) to a school where the principal would mentor them for approximately four months.  At the end of that mentoring period participants attended a retreat in December where they shared their experiences.  Participants were then reassigned to a different school for one month before returning to their original school of assignment.  The classroom training, which began during the summer intensive program, continued on Tuesday evenings and all day on Fridays throughout the ensuing school year and Program participants were required to attend these sessions.  (Walker Aff., Ex. D at 47:10-23; Ex. F. at 31:16-24; Ex. G 30:8-11.)

15.     The Academy's Participant Handbook governed both the Academy and the participants in the Program.  (Walker Aff., Ex. D at 60:9-21.)[2]

---

[2]     All handwritten notations and highlighting in the Handbook were made by Howell. (Walker Aff., Ex. D at 57:13-24.)

16.     The Handbook set forth a code of conduct which it expected its aspiring

principals to observe.  Specifically, the Handbook provided "[i]ntegrity, honesty and respect for

others are among the operating principles that we highly value.  The Leadership Academy

expects Aspiring Principals to strive to perform their duties with integrity and honesty, as well

as, maintain a working environment that encourages mutual respect, promotes congenial

relationships and is free from all forms of harassment."  (Walker Aff., Ex. H at 8.)

17.     Upon reviewing the Handbook, Howell understood that harassment,

discrimination and retaliation were in violation of Academy rules.  (Walker Aff., Ex. D at 60:17-

21.)

18.     The Handbook also stressed the importance of attendance, both during the

summer intensive classroom program and the residency portion of the Program.  A pattern of

attendance issues, including latenesses, would impact on the successful completion of the

Program and might result in dismissal from the Program.  (Walker Aff., Ex. H at 20.)

19.     Finally, the Handbook emphasized the fact that aspiring principals would be

assessed on a continuous basis.  If a problem was identified, the participant would be counseled

and coached in order to improve.  If a participant did not improve, Kathy Nadurak ("Nadurak"),

who was then Vice President of the Aspiring Principals Program, could recommend that a

candidate be placed on probation or dismissed from the Program.  (Walker Aff., Ex. H at 21; Ex.

D at 52:12-53:20.)

20.     In addition to involuntary dismissal, participants were able to voluntarily

withdraw from the APP.  Regardless of whether a participant was dismissed or chose to

withdraw, the participant retained the right to return to his or her former title with the DOE

without any loss of DOE seniority or compensation.  In the case of dismissal, no information

regarding that decision was placed in the participant's DOE personnel file.  (Walker Aff., Ex. H at 21-22.)

21.     Howell understood that if a participant performed in an unsatisfactory manner during the Program, Academy personnel would coach that participant to enable him/her to overcome the performance deficits.  If the individual was still unable to meet Program requirements, he or she would be dismissed from the Program.  (Walker Aff., Ex. D at 52:12-53:20, Ex. F at 43:2-22.)

22.     The 2004-2005 class at the Academy contained approximately 91 members and was divided into three school-based groups called cohorts:  elementary school, middle school and high school.  Howell was assigned to the elementary school cohort.  (Walker Aff., Ex. D at 62:4-6, 62:24-63:12, 66:20-22; Affidavit of Kathy Nadurak ("Nadurak Aff.") ¶ 8.)

23.     The facilitators of the elementary cohort were Ilene Friedman ("Friedman") and Claire McIntee ("McIntee"), both employees of the Academy.  These facilitators divided their thirty-member cohort into five smaller groups of six Program participants.  (Walker Aff., Ex. D at 67:9-68:12; Ex. F at 6:5-6, 14:5-9; Ex. G at 7:19-8:9, 26:13-16.)

24.     Groups were assigned at the beginning of the summer and participants remained in that group for the duration of the Program.  (Walker Aff., Ex. G at 27:9-11.)  According to Howell, her six person group included one Asian, two Hispanics, one Caucasian and two African Americans.  (Walker Aff., Ex. D at 79:9-24.)  Robert Bender ("Bender"), the Program participant with whom she shared a mentorship at P.S. 321 during the Program's residency phase was not a member of her six-person group.  (Walker Aff., Ex. D at 81:23-82:9.)

25.     There was limited interaction between the various six-person groups during the summer intensive classroom program.  Most exercises were undertaken within the six-person

group, although there were three joint exercises with the other groups in the cohort.  (Walker Aff., Ex. D at 82:10-85:22.)

26.     As a result, Howell admitted that she had no knowledge as to the feedback that Bender received during the summer intensive classroom program, nor does she have knowledge about the feedback he received from Academy personnel or his peers.  (Walker Aff., Ex. D at 87:8-88:12.)

27.     At the summer intensive classroom program, participants were given written assignments and engaged in simulations of real-life situations affecting principals.  They were given the opportunity to evaluate and be evaluated by their peers.  Participants were also evaluated on an individual basis and on their ability to work within a group by Academy personnel, specifically, the cohort facilitators.  (Walker Aff., Ex. D at 68:13-69:19; Ex. F at 22:7-10, 17-20.)

28.     Peers used the 360 Degree Feedback form to evaluate each other on a weekly basis.  According to Howell, this was the "culminating activity" at the Academy because peers grade how "you interact, how you coordinate an activity, how you speak, how you listen to others, and how you manage a project as a principal and as a teacher."  (Walker Aff., Ex. D at 69:20-71:4; Ex. F at 24:22-26:2, 14-17.)

29.     Academy personnel, such as McIntee and Friedman, did not use the 360 Degree Feedback form to evaluate program participants.  However, these instructors were present when the peer feedback was being given and they provided their own verbal feedback on participant performance.  (Walker Aff., Ex. D at 71:18-72:7.)

30.     Another form of peer review was the glow/grow form in which participants evaluated their colleagues by complimenting them on a particular activity and then suggesting areas for improvement.  (Walker Aff., Ex. D at 72:10-73:5.)

31.     Academy management personnel did not complete glow/grow forms on Academy participants.  (Walker Aff., Ex. D at 73:6-12.)

32.     The 360 Degree Feedback form and the glow/grow form were only used during the summer intensive classroom program, not during the residency phase of the Program. (Walker Aff., Ex. D at 73:13-18.)

**Howell's Performance at the Summer Intensive**

33.     The 360 Degree Feedback forms from her peers reveal that Howell did not always perform up to expected standards.  One peer commented that under Howell's leadership the group had a tough time planning an activity and suggested that Howell should have brokered a synthesis of different ideas.  This same individual felt confused by Howell's communications and complained that the group ran out of time for its oral presentation.  This individual thought that Howell should have delegated more and not shouldered as much of the work as she did. (Walker Aff., Ex. I.)

34.     According to Friedman, Howell was quiet, tended to take notes and did not speak frequently.  Some, but not all, of her written product met standards.  She also, on occasion, was late with her Academy assignments.  (Walker Aff., Ex. G at 44:18-25, 131:21-25, 143:12-17.)

35.     Friedman testified that she became concerned about Howell during the last week of the summer intensive classroom program when, during Howell's turn to lead her six-person group, Howell made it clear that although she took notes of what was said by her group colleagues, she did not weigh their thoughts or incorporate their ideas into the final work product.  (Walker Aff., Ex. G at 45:20-52:7.)

8

36.     McIntee described Howell's performance during the summer intensive classroom program as "average."  She also recalled that Howell was late with a couple of her individual assignments and attended the sessions late once or twice.  (Walker Aff., Ex. F at 38:20-23, 39:16-19, 49:12-16.)  In addition, McIntee recalled an occasional problem with the quality of Howell's work product.  (Walker Aff., Ex. F. at 51:10-18.)

37.     McIntee also suggested to Howell that she share more of her experiences with the group in which she was involved and answer questions from group members.  (Walker Aff., Ex. D at 76:22-78:7.)

**Howell's Performance During the Residency Phase of the Program**

38.     The residency phase of the Program began on August 29, 2004, and Howell was assigned to P.S. 321 in Park Slope, Brooklyn.  (Walker Aff., Ex. D at 94:6-11.)

39.     Howell did not request this school.  She had asked to be assigned to P.S. 153 in Harlem, a school that had previously participated in the residency phase of the Program. (Walker Aff., Ex. D at 94:18-95:17, 125:10-13.)

40.     Howell is unaware of any Program participant who requested a particular assignment and is also unaware of any participant who received an assignment that they requested.  (Walker Aff., Ex. D at 95:18-96:6.)

41.     McIntee confirmed that participants were not given a choice of school.  Instead, participants were assigned in pairs to a school.  Pairs were matched up so that the skills of the participants complemented each other.  For example, one person might be strong instructionally and the other person might have good interpersonal skills.   (Walker Aff., Ex. F at 31:12-24, 32:16-20.)

42.     Participants, including Howell, were assigned to schools based on a similar matching process predicated on the areas where the facilitators thought that the candidates could

9

benefit and learn at the mentor school.  Howell was placed at P.S. 321 because Principal

Elizabeth Phillips ("Phillips") was known as a strong curriculum leader and that was an area in

which Howell could benefit.  (Walker Aff., Ex. G at 58:23-60:5.)  Bender was placed at P.S. 321

to provide him an opportunity for leadership and additional curriculum work.  (Walker Aff., Ex.

G at 61:8-14.)

      43.     Howell conducted research on P.S. 321 and learned that the school was

committed to literacy and to the writing process.  She also learned that Phillips, the principal of

the school, had been a kindergarten coordinator, which meant to Howell that she understood

what was involved in leading a school.  (Walker Aff., Ex. D at 102:13-105:13.)

      44.     In fact, Phillips had extensive experience as a mentor.  She mentored student

teachers, teachers, aspiring principals, and principals prior to serving as a mentor for the

Academy.  (Transcript of the Deposition of Elizabeth Phillips, attached as Exhibit J to the

Walker Aff. at 26:7-27:22.)  Like Phillips, Friedman also had extensive mentoring experience

prior to serving as a facilitator for the APP.  (Walker Aff., Ex. G at 14:3-20:24.)

      45.     Prior to the start of the residency portion of the Program, Phillips sent an e-mail to

Howell and Bender welcoming them to the school, advising them that Friedman and McIntee

had said wonderful things about them and suggesting that they take the time to look up the

school and to visit the PTA's website.  She also explained that the school was large and in a

diverse neighborhood.  Finally, Phillips asked for a short "bio" on each of them so that she could

introduce them to the staff.  (Walker Aff., Ex. D at 124:5-8, 126:11-13; Ex. J at 33:21-34:3;

41:5-15; Exhibit K.)

      46.     Upon receipt of this e-mail, Howell sent a reply e-mail stating, truthfully, that she

was happy to be at Phillips' school.  (Walker Aff., Ex. D at 126:22-127:5.)

47.     Howell understood that during the residency phase of the Program, she would be given assignments by the Academy, of which her principal would be aware, and that the principal would also assign her tasks at the school.  (Walker Aff., Ex. D at 107:20-108:6.)

48.     Howell also recognized that Academy personnel would visit the mentor school during the residency phase of the Program and evaluate the participants.  (Walker Aff., Ex. D at 108:7-17.)

49.     At P.S. 321, Phillips was her mentor and Howell reported to Phillips, to Carolyn Forlano ("Forlano"), the assistant principal for the upper grades, and to Katherine Ferrara ("Ferrara"), the assistant principal for special education.  (Walker Aff., Ex. D at 113:15-114:10.) Beth Handman was the third assistant principal at P.S. 321 and was responsible for grades K-2. (Walker Aff., Ex. J at 10:16-21.)

50.     In her role as mentor principal, Phillips met with her mentees every day, first thing in the morning and at other times as well to brief them on the happenings at the school. They also did walk throughs together where Phillips would comment about what they were seeing in the classrooms and ask her mentees for their assessments as well.  In addition, Phillips attended various meetings with her mentees.  (Walker Aff., Ex. J at 46:2-21.)

51.     According to Phillips, both of her mentees attended her grade meetings and faculty meetings, observed teachers, conducted one-on-one meetings with teachers, and they each attended meetings and professional development sessions that she held.  She would provide her opinions as to the model teachers in the different grades so that her mentees could spend time learning curriculum from these teachers.  She also would encourage her mentees to sit in on parent meetings and thereafter she discussed what had occurred with them.  (Walker Aff., Ex. J at 47:11-49:9.)

52.     During the first month of school, Phillips' mentees "shadowed" her and spent several hours to an entire day with her.  Thereafter, the amount of time she would spend with her mentees would vary depending on the projects and assignments she had given to them.  However, according to Phillips, she met with each of her mentees every day for at least an hour and a half in total.  (Walker Aff., Ex. J at 51:18-52:13; 58:6-10.)

53.     Howell admitted that she met with Phillips and Forlano on a daily basis and with Ferrara a few times a week.  (Walker Aff., Ex. D at 115:2-11, 117:11-17.)

54.     In fact, Howell admitted that she met with Phillips and Bender at 8:00 a.m. each morning, and at 9:30 a.m. Phillips, Howell and Bender would perform a walk through of the building.  (Walker Aff., Ex. D at 117:18-118:21, 641:7-8.)

55.     Although they worked at the same school, Howell and Bender received separate assignments from Phillips.  Howell did not observe Bender, nor was she in a position to know whether he was performing well or poorly.  (Walker Aff., Ex. D at 130:8-131:12, 131:21-132:7.)

56.     Phillips assigned Howell to more of the projects that involved supervising teachers because Howell had more experience in this area than Bender did.  (Walker Aff., Ex. J at 54:5-9.)

57.     Howell's most important assignment was to work with cluster teachers, namely those who taught individual subjects, such as science, art, music, and physical education.  She was also in charge of the Penny Harvest Common Sense Round Table and she worked with the Meet the Writers Committee.  Bender was assigned to work with the Arts Committee and the Brooklyn Museum; he had responsibility for the lower grade lunch period and was involved in a program addressing student lateness.  (Walker Aff., Ex. J at 72:23-74:12.)

58.     As part of the Program, mentor principals are required to evaluate their mentees three times during the residency phase.  Phillips' evaluations were based on her own observations as well as the feedback that had been volunteered by teachers.  (Walker Aff., Ex. J at 56:2-24.)

59.     Phillips began to notice problems in Howell's performance as early as October, 2004.  For example, there was a general lack of clarity in Howell's communications.  One example was the Penny Harvest project in which Howell had the opportunity to conduct a professional development meeting for teachers in the kindergarten grade.  Prior to the meeting, Phillips suggested to Howell that the meeting should be educational and have a math focus and instead, Howell's meeting focused on arts and crafts projects that could be created using pennies.  (Walker Aff., Ex. J at 78:8-79:18; 81:2-18; 93:20-94:25.)

60.     In November, 2004, Phillips provided a formal evaluation of Howell.  She met with Howell prior to the formal submission of the evaluation and either showed it to her or talked to her about it.  (Walker Aff., Ex. J at 60:22-61:11.)

61.     In her evaluation, Phillips wrote that Howell met the "expected standard" in only two of the nineteen areas in which she was evaluated, had "not met standard" in two other areas and was working "towards meeting the standard" in the remaining fifteen areas.  (Walker Aff. Exhibit L.)

62.     Specifically, Phillips noted that Howell had difficulty accepting criticism and took criticism personally, did not internalize feedback, was unclear in her intentions with respect to staff, was late and often forgot meetings, and had difficulty adapting her communication style to her audience.  (Walker Aff., Ex. D at 134:19-135:6; Ex. J at 84:13-101:11; Ex. L.)

63.     Phillips also spoke with Friedman about Howell's performance.  Phillips indicated that Howell needed to work on certain areas and that she was failing to progress.  She also stated that Howell had difficulty in tailoring her communications to her audience and had issues communicating clearly with Phillips.  (Walker Aff., Ex. G at 76:3-77:10.)

64.     Phillips testified that in December, 2004, she also began to question Howell's honesty.  Phillips had assigned Howell to work with two physical education teachers who were new to the team teaching concept.  Howell reported to Phillips that she had had a good meeting with both of the teachers and described her meeting with them in detail to Phillips.  In an informal discussion with one of the teachers, Phillips commented that she was pleased that her meeting had gone well with Howell, and the teacher stated that they had never met with Howell.  Phillips then spoke with the other gym teacher who confirmed that they had never met with Howell.  (Walker Aff., Ex. J at 105:10-108:7.)

65.     Phillips recalled other incidents in which she questioned Howell's judgment, such as the time when she brought her son to school without notifying Phillips and when she stated that she had to leave early to attend the Academy, when in fact, she had a meeting at her son's school.  (Walker Aff., Ex. J at 108:8-25.)

66.     According to Howell, on or about January 5, 2005, during a meeting with Phillips, Phillips advised Howell that she intended to recommend that Howell be placed on probation since the latter did not meet with the two cluster teachers with whom she was supposed to meet.  Phillips also raised the fact that she did not believe that Howell communicated sufficiently with her and that if she was placed on probation, an improvement plan with specific timetables could be established.  (Walker Aff., Ex. D at 386:3-388:5.)

**Howell is Placed on Probation and then Resigns From the Program**

67.     In January 2005, Phillips expressed her concerns to Friedman that Howell was not progressing and, for the first time, mentioned her concern that Howell would be unable to handle a principal position in the fall of 2005.  Phillips also mentioned that Howell's communication issues were not improving and that she continued to lack follow through.  (Walker Aff., Ex. G at 89:20-90:6; 91:6-92:5; Ex. M.)

68.     On or about January 11, 2005, Phillips began to formally document her concerns about Howell's performance to Academy personnel.  In an e-mail to Ilene Friedman dated January 11, 2005, Phillips wrote that Howell had not been honest with her on three separate occasions in the past few weeks.  According to Phillips' e-mail, the first two incidents had to do with lateness and not attending a meeting that Howell was supposed to attend.  The third incident was more significant and involved two gym teachers, who Howell reported that she had met with, both of whom denied that they had met with Howell.  When confronted with the fact that both teachers denied meeting with her, Howell began to retreat from her story and acknowledged that no formal meeting had occurred.  (Walker Aff., Ex. M; Ex. J at 114:3-7.)

69.     Friedman testified that she was not surprised that Phillips had expressed concerns about Howell's ability to communicate because she too, had experienced difficulty communicating with Howell.  (Walker Aff., Ex. G at 80:23-81:2.)

70.     For example, in January, 2005, Friedman and Howell spoke about Howell's professional development plan, an Academy assignment that was due that day.  Friedman testified that Howell was unclear during these discussions as to why she did not have her assignment completed.  At first, Howell claimed that she had left her professional development plan at home because she was having computer issues, but then shortly thereafter, provided the

assignment in handwritten form to Friedman.  (Walker Aff., Ex. G at 127:22-128:25, 135:15-136:23.)

71.     On January 19, 2005, Howell had a meeting at the Academy with Friedman and Nadurak, the Academy's Vice President of the Aspiring Principals Program, who was responsible for monitoring the progress of APP participants.  At this meeting she was formally placed on probation.  (Walker Aff., Ex. D at 643:21-24; Ex. G at 41:16-25.)

72.     Howell was told that, as a condition of her probation, she would be required to improve communications with Phillips, maintain a daily journal, meet daily with Phillips after completing her daily journal entry and send a copy of her daily journal entries to Friedman.  (Walker Aff., Ex. D at 393:11-15, 396:8-25.)

73.     Howell did not raise any claim of discrimination or retaliation at the time that she was placed on probation.  (Walker Aff., Ex. G at 110:9-17.)

74.     On January 20, 2005, Howell received a letter from Nadurak formally placing her on probation.  (Walker Aff., Exhibit N.)  The letter summarized their discussions the previous day.  Specifically, the letter stated:

> Your behavior as described by Ms. Phillips has not met this standard [of trust].  There has been confusion about what you have and have not done on your assignments in the school.  Even in our meeting both Ilene and I had to closely question you in order to understand what actions you had taken to fulfill your assignments.  Your presentation of the facts was unclear and misleading.  This problem occurred during our meeting when we discussed your written assignment on professional development.  You said that you "forgot" to hand in a section last week.  You didn't bring it with you and then had to retrieve it.  What you handed Ilene was a draft written in pencil.  Your conversation with us led both of us to believe that we would be receiving a finished product.

(Walker Aff., Ex. N; Ex. G at 108:17-109:7.)

75.     During her probation, Howell claims to have received positive feedback from Phillips.  Upon further questioning, however, she admitted that Phillips had criticized her

performance during the probation period with respect to the lunchroom and her interaction with one of the science cluster teachers.  (Walker Aff., Ex. D at 447:8-448:23.)

76.     The incident involving the science cluster teacher occurred when Howell reported to Phillips that she had had a good meeting with this teacher and commented that she found it interesting that students' test scores revealed that children who struggled in math did well in science.  Phillips testified that Howell's comment seemed odd and that when she spoke with one of the fourth grade teachers, who Howell claimed she met with, the teacher did not even know who Howell was and did not have any communications with her regarding math scores.  She also met with the science teacher who stated that his meeting with Howell was confusing and that he did not understand the assignment that she gave to him.  (Walker Aff., Ex. J at 110:24-113:25; Ex. M.)

77.     On January 31, 2005, Phillips sent a lengthy letter to Friedman and Nadurak updating them on Howell's performance since she had been on probation and highlighting her continuing serious concerns about Howell's leadership abilities as well as her misleading and dishonest reporting.  Specifically, Phillips identified several incidents where Howell stated that she had met with or observed teachers with whom she had not met or observed, and claimed to have instituted a new system in the lunchroom for tracking meals when the system actually had been in operation for several years at P.S. 321.  (Walker Aff., Ex. M.)

78.     On February 4, 2005, Howell had another meeting at the Academy with Nadurak and Friedman at which time she was advised that she would have to withdraw from the Program by February 18, 2005 or she would be dismissed.  (Walker Aff., Ex. D at 365:3-366:12, 644:7-18.)

79.     It was at this point that Howell first asked whether she could be reassigned to another school.  The request was denied.  (Walker Aff., Ex. D at 462:17-463:9.)

80.     On or about February 8, 2005, Howell wrote her letter withdrawing from the APP program.  (Walker Aff., Ex. D at 364:9-18, 369:8-11; Ex. O.)

**Howell's Complaints of Discrimination Against Phillips**

81.     Although she was unclear as to the timing, Howell testified that sometime in October 2004, she complained to Friedman that she was the victim of race discrimination because Bender was receiving better assignments and more mentoring than she was receiving. To prove her point, Howell noted that Phillips was not angry with Bender when he performed Academy assignments, yet she was upset with Howell for completing such assignments. According to Howell, Friedman stated that she did not see that as discriminatory.  (Walker Aff., Ex. D at 243:23-245:19, 247:19-248:6.)

82.     Sometime this same month, Howell claimed to have had another conversation with Friedman where she repeated her belief that Phillips was discriminating against her by favoring Bender since Bender was able to participate in activities in which she was unable to participate.  According to Howell, Friedman stated that she had spoken to Phillips and she did not believe that any discrimination was occurring.  (Walker Aff., Ex. D at 308:12-309:22.)

83.     Friedman had no recollection that Howell complained to her about Phillips engaging in race discrimination.  According to Friedman, it was Phillips who first raised this issue with her in January.  (Walker Aff., Ex. G at 69:5-70:20.)

84.     According to Howell, she also confronted Phillips to express her concerns that Phillips was discriminating against her.  Her reason for approaching Phillips was so that Phillips would cease her discriminatory treatment of Howell.  (Walker Aff., Ex. D at 252:16-253:18, 286:12-288:22.)

85.     During this discussion, Howell mentioned that Phillips' previous mentee, Renee Belton, had complained to Howell that Phillips had treated her differently, but did not say who she had treated her differently from.  (Walker Aff., Ex. D at 255:21-256:21.)  Howell acknowledged that Belton did not provide her with any specifics regarding this hearsay report of discrimination.  (Walker Aff., Ex. D at 256:18-21.)

86.     In point of fact, Howell acknowledged that both 2003-2004 Academy participants who served their residency at P.S. 321 under Phillips were African American.  (Walker Aff., Ex. D at 225:15-20.)  Both successfully completed the program under Phillips and became principals. (Walker Aff., Ex. D at 577:24-578:18; Nadurak Aff. ¶ 7.)

87.     Howell also admitted that during her discussion with Phillips, she learned that Phillips' son-in-law was African American, her granddaughter was bi-racial and her husband taught African American History at Fordham University for the past 37 years.  (Walker Aff., Ex. D at 258:4-19; Ex. J at 22:5-8.)

88.     According to Howell, Phillips denied that she engaged in discrimination and insisted that Howell was receiving a good experience.  (Walker Aff., Ex. D at 259:21-25.)  She also advised Howell that if, in the future, she felt that any of Phillips actions were discriminatory, she should immediately bring those actions to her attention. (Walker Aff., Ex. D at 278:16-21.)

89.     Phillips testified that her meeting with Howell occurred during the first week of November, when Howell explained that some of her impressions of Phillips were clouded by negative comments that Howell had heard about Phillips from Renee Belton, Phillips' mentee in 2003-2004, specifically that Phillips was a racist.  According to Phillips, Howell begged her not to mention this conversation to the Academy or to anyone else.  Phillips did not mention this conversation to Friedman until January 2005, primarily because she thought that she had put

Howell's concerns to rest and they could move forward.  (Walker Aff., Ex. J at 88:22-91:15; Ex. G at 69:5-70:20.)

90.    Howell testified that once she confronted Phillips with her belief that Phillips was discriminating against her, Phillips began to talk down to her and to question Howell's performance of certain tasks.  (Walker Aff., Ex. D at 355:5-356:6.)  For example, Howell recounted a time when Phillips privately criticized her for a letter she had written to cluster teachers, implying that Howell "was dumb to write [the] letter."  (Walker Aff., Ex. D at 357:10-15, 358:8-15, 360:12-21.)

91.    When questioned about this letter at her deposition, however, Howell admitted that Phillips' criticism was twofold:  insufficient time was provided to teachers with regard to the timing of the meeting and that sending one letter listing all invitees made it obvious that not everyone was invited to the meeting.  (Walker Aff., Ex. D at 421:18-424:24; Ex. P.)

92.    During her deposition, Howell claimed that Phillips discriminated against her by criticizing her; by providing better experiences to Bender, the Caucasian Program participant also assigned to P.S. 321 during the Program's residency phase; and by assigning Howell to work only with African American and Hispanic staff.  The following incidents were identified by Howell as racially discriminatory:

- In a private discussion in Phillips' office, Phillips criticized Howell's presentation on the Penny Harvest project to which she had been assigned, noting that Howell had not adapted her discussion of the project to her audience.  (Walker Aff., Ex. D at 136:17-138:24, 313:4-314:9; 553:16-554:4.)

- Phillips commented to Howell that certain Academy assignments in which Howell was involved were a waste of time.  (Walker Aff., Ex. D at 140:6-143:25, 144:2-145:5, 554:5-18.)

- Phillips made false reports to the Academy about Howell, such as advising the Academy that she missed the date for submitting grant requests for the

Common Sense Project and that she did not meet with various teachers with whom she had met.  (Walker Aff., Ex. D at 559:20-560:9.)

- Phillips permitted Bender, but not Howell, to attend one of the monthly Parents as Partners programs where parents are invited into the school to read with their children.  Both Bender and Howell asked to be excused from the Academy's Friday session to attend this event.  Bender's request was granted and Howell's was not.  (Walker Aff., Ex. D at 175:15-176:18.)  To Howell's knowledge, this was the only Parents as Partners program which Bender attended.  (Walker Aff., Ex. D at 177:8-16.)

- Although she does not know how many of Bender's staff meetings Phillips attended, Howell is certain that Phillips attended more of Bender's staff meetings than her staff and cluster meetings.  (Walker Aff., Ex. D at 215:24-216:25, 549:14-17.)

- Phillips placed Bender at the front door to the building in the morning and in the afternoon in order to greet the parents and students, while Howell was placed at the rear door where the only people who came through that door were "just some kids."  (Walker Aff., Ex. D at 219:7-220:17, 221:19-25, 549:10-13.)

- Phillips permitted Bender to attend a photo shoot for tsunami victims, instead of attending the Academy, but Howell was not permitted the same opportunity.  (Walker Aff., Ex. D at  226:11-227:4.)

- Phillips permitted Bender to observe instructional meetings with staff at least twelve times while Howell was only invited to two such meetings. (Walker Aff., Ex. D at 229:6-17.)

- Phillips permitted Bender to participate in a program when visiting principals were scheduled to attend P.S. 321, but Howell was sent to Long Island City to deliver ECLAS test scores.  (Walker Aff., Ex. D at 269:2-270:17, 551:21-23.)

- Phillips spent more time with Bender than she did with Howell.  Phillips permitted Bender to monopolize the 8:00 a.m. meetings between Howell, Bender and Phillips.  As a result, Phillips mentored Bender more than she mentored Howell.  (Walker Aff., Ex. D at 543:11-22, 549:19-22.)

- Phillips assigned Howell to all issues involving African American teachers, students and parents and did not allow her exposure to Caucasian staff, parents or students.  (Walker Aff., Ex. D at 282:3-22, 554:19-556:2.)

- Phillips required that Howell revise letters to parents that had been written by certain African American and Hispanic staff who Phillips did not believe wrote well.  (Walker Aff., Ex. D at 146:2-147:14, 150:8-24.)

- In general, Howell claimed to have been subjected to discrimination by Phillips at all events, by her tone, her assignments and the way that she treated Howell.  (Walker Aff., Ex. D at 350:17-20.)

93.     These same incidents also form the predicate for Howell's retaliation claim against Phillips.  Thus, Howell testified that Phillips retaliated against her by not supporting her as a mentor, preventing her from having the same experiences as Bender, being disrespectful in her speech to Howell, demanding answers from Howell, and accusing Howell of lying.  (Walker Aff., Ex. D at 562:6-563:25.)

**<u>Howell Herself Contradicted Each and Every Allegation of Discrimination</u>**

94.     While Howell claims that Phillips did not spend time with her or permit her to observe Phillips in her daily activities, Howell admitted at deposition that she attended an observation with Phillips for Maria Chales, an employee assigned to Howell, and was present when Phillips conducted Chales' performance review.  (Walker Aff., Ex. D at 156:12-23.)

95.     Likewise, while Howell complained that Bender was excused from attending the Program's Friday classroom session in early January, so that he could attend the monthly Parents as Partners program, but she was not, she admitted that Phillips had, in fact, approved the request that she be excused from the Friday session in order to attend the Parents as Partners program. (Walker Aff., Ex. D at 187:2-14; Ex. J at 137:13-139:2.)

96.     With respect to her claim that the assignment to the rear door was somehow improper, Howell ultimately admitted that parents also used the rear door (Walker Aff., Ex. D at 222:14-16) and that kindergarten classes and other classes entered the building through the back door since their classrooms were located closer to that door.  (Walker Aff., Ex. D at 344:18-25.)

97.     In fact, according to Phillips, the same number of children entered the school through the front and back entrances -- some kindergarten, first and second grades used the front

entrance and the upper grades and a few kindergarten classes utilized the rear entrance to the school.  (Walker Aff., Ex. J at 135:2-136:12.)

98.     Although Howell believed that Phillips did not speak to Bender in the same manner as she spoke with Howell, she also acknowledged that she was not present to observe all of their interactions.  (Walker Aff., Ex. D at 359:7-360:11.)

99.     With respect to Howell's claim that Bender was permitted to attend a photo shoot for tsunami victims, she admitted that he asked to attend this event and she did not.  (Walker Aff., Ex. D at 228:11-22.)

100.     When asked how she knew that Bender sat in on twelve meetings, Howell admitted that her evidence was anecdotal – Bender would mention what he had done during the day or she would pass by Phillips' office and Bender would be in there.  (Walker Aff., Ex. D at 340:13-342:17.)

101.     With respect to her claim that Phillips mentored Bender more, Howell admitted that when she asked Phillips to meet with her one-on-one, Phillips agreed to do so; that Bender monopolized meetings because he liked to have center stage; that Phillips did not prevent Howell from speaking; that Bender and Phillips were friendly and would be together before the 8:00 a.m. meeting; and that Howell never attempted to make an appointment to see Phillips prior to any of these morning meetings.  (Walker Aff., Ex. D at 544:22-546:25, 615:2-20.)

102.     Howell's claim that she missed one visitor's meeting, which Bender was permitted to attend, so that she could deliver ECLAS test scores in Long Island City, fails to address the fact that such meetings occurred at least ten times a year, she was responsible for the ECLAS program, including preparing the teacher's memorandum and delivering the ECLAS test

NY1 26454735.5

scores, and that Bender had no responsibility for or involvement in the ECLAS program. (Walker Aff., Ex. J at 71:15-72:16; 131:11-15; Ex. Q.)

103.    With regard to her claim that Phillips was unhappy with two assignments given by the Academy, Howell acknowledged that Phillips was unhappy with the Academy for giving the assignments because she did not believe they were worthwhile.  (Walker Aff., Ex. D at 326:11-328:25.)

104.    Although Howell originally stated that she was not permitted to interact with Caucasian teachers, on the second day of her deposition she recanted this position.  She also admitted that Phillips never drew any distinction between the Caucasian and non-Caucasian teachers.  (Walker Aff., Ex. D at 336:2-24.)

105.    Although Howell claimed that she was not invited to meetings by Phillips, when confronted with minutes of a meeting which identified her as an attendee, she retreated from this position as well.  (Walker Aff., Ex. D at 412:3-413:8; Ex. R.)  She also admitted that she attended all meetings of district principals (Walker Aff., Ex. D at 415:6-416:5; Ex. R), and meetings which Phillips held with parents, which meetings were held once or twice a month. (Walker Aff., Ex. D at 419:5-24.)

106.    Although Howell claimed that Phillips' failure to attend Howell's cluster meetings was racially motivated, Howell admitted that she did not ask Phillips to attend such meetings.  (Walker Aff., Ex. D at 548:16-19.)

107.    In her Complaint, Howell alleged that Phillips programmed Howell to fail by, *inter alia*, intentionally changing meetings on short notice.  (Walker Aff., Ex. A ¶ 10.)  However, at her deposition, Howell retreated from this position and denied that Phillips changed meetings so that Howell could not attend.  (Walker Aff., Ex. D at 570:25-571:12.)

NY1 26454735.5

108.    Howell also conceded that Phillips never made any comment to her concerning her race.  (Walker Aff., Ex. D at 556:18-22.)

109.    In fact, while Howell complained that Phillips treated her poorly and articulated a litany of complaints against her, Howell nonetheless gave Phillips a very generous holiday present (Walker Aff., Ex. D at 383:21-384:11; Ex. S) and insisted that she liked Phillips very much.  (Walker Aff., Ex. D at 352:25-353:2.)

110.    Howell did not file any discrimination complaint against Phillips with the Equal Employment Opportunity Commission.  (Walker Aff., Ex. D at 568:19-23.)

**Howell's Complaints of Discrimination and Retaliation Against the Academy**

111.    Howell admitted that she was not discriminated against or otherwise treated unfairly during the summer intensive classroom program.  (Walker Aff., Ex. D at 185:14-186:5.)

112.    However, she claimed that the Academy engaged in race discrimination because it did not follow its own policies.  Specifically, Howell testified that other participants were treated more favorably and given more of an opportunity to improve their performance than she was given.  According to Howell, the names and races of the participants who were given more opportunity were Aaron Rosenberg (Caucasian), Francis Ruiz (Caucasian), Lawrence Wright (Caucasian), Yvonne Chin (Asian), Michele Ashley (African American), Michele Shannon (African American), Linda Bell (African American), and Joseph Bernazzani (Caucasian). Howell also acknowledged that she did not know the specifics of any situation involving any of these individuals.  (Walker Aff., Ex. D at 451:10-461:14, 465:11-466:6, 476:20-477:8, 479:19-480:7, 529:10-539.6; Ex. T.)

113.    In point of fact, Rosenberg was removed from the Program and Bernazzani resigned from the Program for personal reasons.  (Walker Aff., Ex. T.)  In addition to Rosenberg, eight other Caucasian participants, seven African American participants, two Hispanic

participants and two individuals whose race is unknown, were removed or asked to resign from the 2004-2005 Program.  (Walker Aff., Ex. T.)

114.    In addition, Howell testified that the Academy discriminated against her because, after her withdrawal from the Academy, she was required to sit in the "rubber room" until March 17, 2005.  (Walker Aff., Ex. D at 466:7-15.)  The so-called rubber room is a room at the regional office of the DOE, where as many as 68 teachers and other employees are posted pending receipt of an assignment at any given time.  (Walker Aff., Ex. D at 466:17-467:19.)

115.    However, Howell also contradicted herself when she testified that she did not know who made the decision that she should go to the rubber room or how long she should sit in the rubber room until she received another appointment.  (Walker Aff., Ex. D at 472:7-10.)

116.    After Howell withdrew from the Academy, she continued to be a Department of Education employee and while she sat in the rubber room, she continued to collect her full salary.  (Walker Aff., Ex. D at 468:3-472:6.)

117.    In or about March 17, 2005, Howell was reassigned to P.S. 154.  (Walker Aff., Ex. D at 490:17-491:11.)

118.    Howell conceded that Nadurak, the person who made the decision to ask Howell to leave the Program, never retaliated against her.  (Walker Aff., Ex. D at 490:11-14.)

**The Retaliation Allegations Against Friedman**

119.    Howell testified that she began to experience problems with Friedman after she complained to Friedman that she was not receiving Program assignments via e-mail, and that it was wrong for her to be held accountable for completing those assignments that she did not receive.  (Walker Aff., Ex. D at 182:13-183:9.)

120.     Friedman instructed Howell to speak to Bernadette Pizzurro, assistant to Nadurak, because Pizzurro was the person in charge of addressing those issues.  (Walker Aff., Ex. G at 64:8-15.)

121.     Howell wrote to Bernadette Pizzurro, the secretarial coordinator of the Program to advise her about the e-mail problem.  (Walker Aff., Ex. D at 195:4-6, 326:3-7.)  Pizzurro explained that she had been sending Howell's e-mails to the appropriate address, reconfirmed the address for Friedman and asked Howell to see her on November 5, 2004 to resolve the e-mail issue.  (Walker Aff., Ex. U)

122.     Howell believes that her complaint to Pizzurro about not receiving e-mails, was the real reason that Friedman did not permit her to miss a Friday session at the Academy so that she could attend a Parents as Partners program at her mentor school which Bender was permitted to attend.  (Walker Aff., Ex. D at 192:7-193:7, 212:19-24.)

123.     In point of fact, Friedman rejected Howell's request to miss that particular Friday session because that Friday's session had "key activities that we will build on during our month long unit."  Bender's request was granted because in addition to the Parents as Partners meeting, Bender had a previously scheduled a professional development session that day with all fourth grade teachers for whom he was responsible.  Finally, the e-mail suggested that Howell attend the Parents as Partners program at another time.  (Walker Aff., Ex. V.)

124.     Howell also believes that her complaint to Pizzurro about not receiving e-mails, was the reason that Friedman manufactured a complaint that Howell was always late to the Academy, a complaint which Howell claims is untrue.  (Walker Aff., Ex. D at 193:8-23.)

125.     However, on the second day of her deposition, Howell admitted that she had been late to classes at the Academy on two or three occasions.  (Walker Aff., Ex. D at 311:21-312:8.)

126.     So too, Howell admitted that even though she claimed that she was not receiving e-mails from Friedman which she claims were received by other Program participants and contained Program assignments, she could not identify the e-mails which she did not receive, nor did she fail to complete any assignments or attend any meetings as a result of the failure to receive e-mails from Friedman.  (Walker Aff., Ex. D at 196:7-197:16, 203:5-15.)

127.     In fact, Howell believes that there were only two or three e-mails that she did not receive.  (Walker Aff., Ex. D at 319:2-16.)

128.     When questioned further about these e-mails, Howell admitted that she did not know whether other program participants had received such e-mails and she had no idea what the e-mails were about.  (Walker Aff., Ex. D at 323:19-324:17.)

129.     In addition, Howell admitted that she did not know whether Friedman herself sent out her own e-mails or if someone else sent them out on her behalf.  (Walker Aff., Ex. D at 206:8-13.)

130.     Howell also conceded that after her discussion with Pizzurro about the e-mails, she received one e-mail from Friedman and was not aware of any e-mails that Friedman intended to send her that she did not receive.  (Walker Aff., Ex. D at 207:19-208:12.)

131.     While Howell believed that Friedman was upset with her because she complained about not receiving e-mails, she acknowledged that Friedman did not say anything to her to indicate that she was upset; Howell was merely interpreting this from her perceptions of Friedman's body language.  (Walker Aff., Ex. D at 209:18-210:3, 210:21-211:3.)

132.     Howell also admitted that she had no evidence to support her claim that Friedman intentionally diverted her e-mails, other than Friedman's pattern of behavior, specifically, Friedman's reaction when she complained about not receiving e-mails and Friedman's

28

accusations that Howell was late or absent from the Academy.  (Walker Aff., Ex. D at 211:20-212:18, 214:16-215:8, 488:17-489:3.)

Dated:   New York, New York
        June 29, 2007

                         SEYFARTH SHAW LLP

                         By: _____
                            Peter A. Walker (PW-7984)
                            Lori M. Meyers (LM-1913)
                            Jacquelyn G. White (JW-4168)
                         1270 Avenue of the Americas, Suite 2500
                         New York, New York 10020
                         (212) 218-5500

                         *Attorneys for Defendant*
                         *The NYC Leadership Academy, Inc.*

29